IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

PATRICIA ARNOLD,          )
                       )
       Plaintiff,        )
                       )
v.                       )        CASE NO. 3:03-cv-515-F
                       )
TUSKEGEE UNIVERSITY, *et al.*,  )
                       )  (WO-Not Recommended for Publication)
       Defendants.     )

## MEMORANDUM OPINION AND ORDER

This suit is a dispute between Plaintiff Patricia Arnold ("Arnold") and her former employer Tuskegee University ("Tuskegee"). Arnold contends that during her employment with Tuskegee, her supervisor Dr. James E. Webster ("Webster") subjected her to unwelcome sexual harassment and that Tuskegee terminated her employment in retaliation for her complaints about the harassment. Arnold brings claims against Tuskegee for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII").[1] She also brings claims under Alabama state law for intentional infliction of emotional distress, breach of contract, breach of implied covenant of good faith and fair dealing, and negligent hiring, training, supervision and retention. The case is currently before the Court on Tuskegee's Motion for Summary Judgment (Doc. #57), filed January 12, 2005. For the reasons set forth below, the Motion for Summary Judgment

---

[1] Arnold also had claims against Webster and other, but those claims have been disposed of by prior orders of this Court and only the claims against Tuskegee remain.

is due to be GRANTED with respect to all of Arnold's claims pursuant to federal law.  In light of this ruling, the Court declines to exercise supplemental jurisdiction over the claims pursuant to Alabama law and those claims are due to be DISMISSED without prejudice.

## I. JURISDICTION AND VENUE

Jurisdiction over this matter is asserted pursuant to 28 U.S.C. §1331, federal question jurisdiction, and 28 U.S.C. §1367, federal supplemental jurisdiction over the state claims. The parties do not contest personal jurisdiction or venue and the Court finds adequate allegations of both.

## II. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

## III.  FACTS

The Court has carefully considered all deposition excerpts and documents submitted

3

in support of and in opposition to the motion.  The submissions of the parties, viewed in the light most favorable to Arnold, the non-moving party, establish the following material facts:

Arnold first worked for Tuskegee from August of 1989 through September of 1997. During this time period, she worked as a data entry operator and a computer specialist.  In 1990, Arnold wrote a letter to the director of personnel complaining of sexual advances by her supervisor, Obadiah Dudley.  Tuskegee responded to Arnold's complaint by moving her into another position with a different supervisor.  For the next seven years, Arnold worked at Tuskegee until she lost her position as the result of a reduction in force in September of 1997.

During the summer of 1999, Arnold learned of a position available at Tuskegee for a Laboratory Technician/Computer Operator.  Arnold applied for the position.  Webster, an Associate Professor of Physiology in the Department of Biomedical Sciences at Tuskegee who was then the Chairman of the Department,[2] interviewed Arnold.  At that interview, he provided her with a written job description, which stated that the salary range for the position was $25,000-$30,000 per year.[3]  At the time of the interview, Webster told Arnold that her that the salary would be approximately $19,000 for the first year and then it would be raised to between $25,000 and $30,000.  According to the evidence before this Court, viewed in the

---

[2]  It is undisputed that by 2000, Hari Goyal ("Goyal") had replaced Webster as the Chairman of the Biomedical Department.

[3]  This is according to Arnold's testimony.  Webster's account of this conversation is somewhat different.

4

light most favorable to Arnold, this is all that was said about her salary at this interview.

In July of 1999, Tuskegee hired Arnold as a Laboratory Technician/Computer Operator for the College of Veterinary Medicine, Nursing and Allied Health, Biomedical Sciences. Webster became her immediate supervisor. During the remaining course of her employment, Tuskegee only raised Arnold's salary one time from $19,000 to $20,000, a cost of living adjustment. The undisputed evidence in the record is that Arnold's position as a Laboratory Technician/Computer Operator was a regularly budgeted position that was not funded by grant money. It is also undisputed that the Office of Human Resources Management is responsible for establishing the salary for such staff positions.

It is undisputed that when Arnold was rehired in July of 1999, she received a copy of the Tuskegee University Handbook and Policy Statement on Discrimination and Sexual Harassment. At the time she received the handbook, she indicated in writing that she understood that she was required to read the handbook and familiarize herself with the provisions of the policies, procedures and benefits outlined in it. The first section of the handbook plainly advised employees that they have the right without restraint to discuss with the Director of Personnel Services their working conditions. The handbook also contained Tuskegee's policy on sexual harassment and retaliation against individuals for bringing complaints of sexual harassment. Additionally, the handbook explained that individuals who believe they have been sexually harassed may file a written grievance with the Director of Personnel, with a copy going to the University's Affirmative Action Officer.

5

According to Arnold's testimony,[4]  Webster began to subject her to unwelcome sexual attention not long after she began working for him.  According to Arnold, Webster made several remarks that he could take care of her sexually.  He invited her out to dinner.  He invited her to come to his house.  According to Arnold, Webster told her that he was her boss and could fire her because she was working off a grant account that he controlled, rather than out of the basic budget.[5]  "You work with me and I'll work with you" Webster reportedly told Arnold.  Webster acted jealous and upset if Arnold help other male faculty members.  Arnold wanted to take further computer course work at another university and other training opportunities to improve her job skills.  When she approached Webster about these requests, he implied that these opportunities were tied to her acceding to his sexual demands on her. After Arnold had repeatedly refused Webster's advances, he became very rude and hostile to her.  Not surprisingly given this change in his treatment of her and his threats to fire her, Arnold feared that she would lose her position.[6]

At Webster's request, Arnold went to Webster's home in March of 2000.  He initiated sexual contact which culminated in the couple having sexual intercourse.  In April of 2000,

---

[4]  Webster's account of these events is quite different, but for purposes of this motion, the Court will set forth Arnold's sworn testimony regarding these events.

[5]  Arnold took no steps to verify that she was paid out of a grant account.  It appears from the undisputed evidence before this Court that Arnold's position was not funded out of a grant account.

[6]  Arnold was not only concerned about the loss of her salary.  She had two children enrolled at Tuskegee.  As a benefit of her employment, she received reduced tuition for her children.

Webster again requested that Arnold come to his home.  She did, and they again had sexual intercourse.  Two to three weeks later, Webster asked Arnold to come to his home again.  On this third visit, Arnold told Webster that she would no longer have sex with him.  During the months after this, Arnold reports that Webster was unpleasant to deal with and continued to pressure her for more sexual contact.

In March or April of 2000, Arnold went to the Personnel Office.  While she was there, she spoke to  Barbara Williams  ("Williams"), Vice President/Direct of Human Resources for Tuskegee University.  Arnold expressed an interest in locating a higher paying position.  She discussed her qualifications with Williams.  Arnold asked about whether she should have received a performance evaluation six months after she was hired, and Williams told her that not all supervisors prepare them.  Arnold spoke of things of a personal nature.  At no time during her conversation with Williams in March or April of 2000, did Arnold mention any problems or concerns regarding Webster.

In June of 2000, Arnold asked Webster to complete a performance review of her performance.   He did so and gave Arnold a very favorable performance appraisal.  Interestingly, on this performance appraisal form, Webster commented that due to renovations of a building, Arnold had not had much opportunity to perform duties related to computer operations.[7]  Webster indicated that "if a position elsewhere on campus [sic]

---

[7]  It is undisputed that the job description for the position Arnold occupied required the performance of a number of duties unrelated to computers as well as duties related to computers.  The position was a "laboratory technician/computer programmer" position.

becomes available, [his] permission [was] granted for a transfer." The sole comment on the appraisal form for Arnold's response to the evaluation was that she wanted more money.

In September of 2000, Tuskegee held workshops on preventing sexual harassment in the workplace. Attendance at these workshops was mandatory for all employees. The Equal Employment Opportunity Commission ("EEOC") presented these workshops. Both Arnold and Webster attended the workshop.

In October of 2000, Arnold presented her time sheet for Webster's approval. He refused to sign it. Arnold interpreted his actions and statements as an indication that he would not sign it unless she had sex with him again. Webster contends that he refused to sign it because it was inaccurate.

The incident with the time sheet caused Arnold to go to the Tuskegee Human Resources Department to make a complaint about Webster. On October 19, 2000, Arnold spoke with Williams. Initially, Arnold complained that Webster had asked her out for a date, called her home, became upset when she worked for other male faculty in the department and denied her requests for office furniture, software, and courses. Arnold did not tell Williams that she and Webster had engaged in sexual relations. Arnold's complaint was the first complaint about discrimination or harassment about Webster which Tuskegee had ever

---

Essential duties of this position included setting up laboratory equipment and instruments, cleaning and calibrating laboratory equipment, preparing chemicals and solutions, providing laboratory instructions for courses, preparing animals for experiments, maintaining records, and other tasks.

received.

In response to this conversation, Arnold was given leave with pay and instructed to file a written statement regarding the harassment. Tuskegee conducted an investigation of Arnold's complaint. On October 20, 2000, Williams interviewed Webster regarding the allegations. Webster told Williams that he and Arnold had been engaged in consensual sexual relations. He also told Williams that there were no funds for the furniture, courses, and software that Arnold had requested. After the interview, Webster submitted a written statement detailing his interactions with Arnold.

Williams then spoke with Arnold and told her that Webster had said that they had consensual sexual relations. On October 30 or 31, Arnold submitted a written statement expanding her complaints against Webster. In this statement, she admitted having had sex with Webster, but stated that she did so out of fear of losing her job.

After the initial investigatory interview, Tuskegee reassigned Arnold to a different supervisor, Goyal. Additionally, it instructed Webster to have minimal contact with Arnold and told him not to retaliate against her in any way. It is undisputed that Webster made no request for sexual favors from Arnold after she complained to Williams about Webster in October of 2000.

Arnold filed a Charge of Discrimination with the EEOC on December 14, 2000. The EEOC did an investigation which included interviewing a variety of people at Tuskegee. Arnold complained about the way the EEOC investigator treated her and another investigator

was assigned to do the EEOC investigation.  As a result of this change in investigators, the EEOC inquiry into Arnold's Charge of Discrimination stretched into late 2001.  On March 19, 2002, Arnold received a cause determination from the EEOC.  On October 16, 2002, the EEOC issued Arnold a right to sue letter.  She filed this lawsuit on January 13, 2003.

During the time she was working under Goyal's direct supervision after her complaints about Webster, Arnold had disagreements with Goyal about her job responsibilities, her attendance, and her time records.  It is undisputed that Arnold refused certain work assignments during the time she was under Goyal's direct supervision.  By the time of Arnold's September 2002 evaluation, Goyal asked that Tuskegee reassign Arnold to another job.

Following the September evaluation, Dean Atkinson requested that Dr. Barbara Diffay ("Diffay"), Associate Dean for Administration for the College of Veterinary Medicine, Nursing and Allied Heath, consider taking on Arnold.  On October 2, 2002, Diffay approached Arnold.  Arnold refused to give Diffay her resume.  On October 4, 2002, Arnold told Dean Atkinson that she would not work for Diffay.  Arnold had heard negative rumors about Diffay and did not feel that she would be comfortable working for Diffay.

On December 16, 2002, Dean Atkinson wrote to Arnold stating that she must accept work assignments.  He told Arnold that, effective January 2, 2003, she would be assigned to Diffay.  Her job duties in this position were to included creation of a database to track grant activities, perform data collection and entry and generate reports, and assist Diffay or the

Data Management Specialist/Assistant in communicating with various person to insure accurate data collection.  Arnold was advised that if she did not accept and perform this assignment in a satisfactory manner, that she would be subject to discipline up to and including discharge.

On December 18, 2002, Arnold applied for the Data Management Specialist/Assistant position, a grade 15 job.  Arnold did not possess the minimum educational requirements or experience with databases for the position.  On December 20, 2002, Arnold wrote to Dean Atkinson that she viewed her transfer to Diffay's supervision as a transfer to the Data Management Specialist/Assistant position.

On January 2, 2003, Arnold failed to report to Diffay.  Instead, she called Dean Atkinson to discuss her transfer to the higher position.  The Dean's secretary advised her to report to Diffay on January 6, 2003, and contact Human Resources about her application for the Data Management Specialist/Assistant position.

On January 6, 2003, Arnold met with Diffay.  She accused Diffay of being a liar. Arnold insisted that she be given work assignments in writing.  She insisted that because she was being asked to assist a grade 15 position that she should just have that position.  Dean Atkinson joined the meeting to explain that Diffay was acting appropriately and that Arnold would be subject to disciplinary action if she failed to perform the duties assigned to her. Arnold filed this suit on January 13, 2003.

On February 18, 2003, Diffay wrote to Arnold regarding her failure to accurately

reflect hours worked on her time sheet. Arnold met with Diffay and called her a liar. Also, Arnold refused to chose a lunch period, and Diffay instructed her that her lunch would be from 12:00 to 1:00p.m. Arnold complained about Diffay to Williams, who insured that Arnold was paid for all the hours she worked, including the lunch hours worked without permission.

On March 18, 2003, Arnold submitted another time sheet that did not comply with Tuskegee's regulations. On March 25, 2003, Arnold was suspended for three days, beginning that day. Arnold states that this is because she could not successfully complete a database by the deadline; she states that she requested and was refused training, assistance, material, and classes to help finish the project. In a written memorandum dated March 25, 2003, Diffay informed Arnold of the suspension and the reason for it. According to Diffay, the disciplinary suspension resulted from: Arnold's insubordinate actions relating to her timesheets; disregard for repeat verbal and written instructions regarding Tuskegee's regulations; Arnold's insubordination in the form of calling Diffay a liar on at least two occasions and accusing Diffay of being unprofessional or inappropriate and refusing to apologize for those comments; Arnold's incorrectly completed time records. This memorandum advised Arnold that the suspension was the last step in disciplinary progression before discharge and that further violation of Tuskegee's policies would result in disciplinary action against her which might include discharge.

On March 31, 2003, the day Arnold returned from suspension, she found that the locks

on her office had been changed.  Arnold asked Williams about this and was told that it was for her protection.  Williams reminded Arnold that she was to attend a training session put on by the EEOC that day.  According to Arnold, Williams instructed Arnold not to say anything at the session and not to ask questions.  Arnold did attend the training session.  In the middle of the presentation, Arnold stood, stated her name, indicated that she had an active lawsuit against Tuskegee, and said that she was not permitted to say anything in the meeting.  The EEOC attorney told her that she could ask general questions, but not things pertaining to her case.

On April 1 at 9:00 a.m., Dean Atkinson and Diffay met with Arnold about the status of an assignment.  Arnold states that no one could explain which assignment they were discussing.  Arnold stated that she had provided her weekly progress report and didn't know what assignment they could mean.  Dean Atkinson and Diffay state that Arnold refused to answer questions, stating that she would forward any information received to her attorney and respond at a later date.  When Arnold persisted in her refusal to respond to questions from Dean Atkinson, Dean Atkinson terminated the meeting.

On April 2, 2003, Dean Atkinson wrote to Arnold regarding the decision to terminate Arnold from her employment, effective immediately.  Arnold states that no reason was given for the termination.  Dean Atkinson made the decision to terminate Arnold's employment.  Diffay believed that based on Arnold's conduct she should be terminated because in the time Arnold worked for Diffay Arnold was insubordinate, did not complete assigned work, and

consistently failed to follow policy regarding time records.

## IV.  DISCUSSION

### A. Title VII Claims

Arnold has two claims against Tuskegee which she brings pursuant to Title VII.  The Court will discuss the merits of the motion for summary judgment as it applies to Arnold's Title VII claims before it discusses her claims pursuant to Alabama law.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  It has long been recognized that "[t]he phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted).  Arnold alleges that she was discriminated against on the basis of her sex because she was subjected to sexual harassment by her supervisor while she was employed with Tuskegee.

In addition to prohibiting discrimination on the basis of sex, Title VII also contains provisions which prohibit retaliation against employees who engage in certain protected conduct.  Under Title VII, it is also an unlawful employment practice for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful

14

employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participate in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Arnold alleges that Tuskegee retaliated against her for complaining about Webster's alleged sexual harassment of her.

### 1. Sexual Harassment

To establish a *prima facie* case of sexual harassment, a plaintiff must show:

> (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) that there is a basis for holding the employer liable."

*Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1199 (11th Cir. 2001).  With respect to the final element of the *prima facie* case, the basis for holding the employer liable, the United States Supreme Court and the Eleventh Circuit Court of Appeals have clarified that there exist two means of doing so: (1) sexual harassment which culminates in a tangible employment action such as discharge, demotion, or undesirable reassignment; and (2) sexual harassment in which no adverse tangible employment action is taken, but which is sufficiently severe to constructively alter an employee's working conditions.  *See, e.g., Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998); *Frederick v. Sprint/United Mgmt. Co.,* 246 F.3d 1305, 1311 (11th Cir. 2001).  The distinction between the two approaches is a significant one.

when a supervisor engages in harassment which results in an

> adverse "tangible employment action" against the employee, the
> employer is automatically liable for the harassment.  In contrast,
> when the supervisor's harassment involves no adverse "tangible
> employment action," an employer can avoid vicarious liability
> for the supervisor's conduct by raising and proving the
> affirmative defense described in the *Faragher* and *Ellerth* case.

*Frederick,* 246 F.3d at 1311 (internal citations omitted).  Assuming, without deciding, that

Arnold has presented sufficient evidence of the first four elements of the harassment claim,

Tuskegee is still entitled to summary judgment because no reasonable jury could find a basis

for holding it liable under the applicable case law.

### a. Adverse Tangible Employment Action Theory

Arnold has not established that Tuskegee should be liable because she suffered an

adverse tangible employment action taken or influenced by Webster.  Arnold's First

Amended Complaint contains very specific allegations relating to her sexual harassment

claim.  She alleges that while repeatedly propositioning her and demanding sexual favors,

Webster told her that he was her boss and threatened to terminate her employment after she

refused his advances.  Arnold clearly alleges that it was these threats from Webster that

caused her to finally agree to have sexual intercourse with him.  It is equally clear that

Webster never attempted to carry through on these threats.  There is no evidence from which

a reasonable jury could find that Webster tried to effect or influence the termination of

Arnold's employment.

In addition to the threats to terminate her employment, Arnold alleges that Webster

offered to help her advance and told her that he would work with her if she would work with

him. Arnold alleges that when she was refusing Webster's unwelcome advances he would be very hostile and abusive towards her.  Eventually, Webster refused to sign Arnold's time sheet.  Arnold interpreted this refusal as a renewed demand for sexual favors and reported the sexual harassment.  It is undisputed that upon her report of the sexual harassment after the time sheet incident, Arnold was fully compensated for the time on the time sheet Webster had refused to sign.

Tuskegee's motion for summary judgment advances the argument that Webster took no adverse tangible employment action against Arnold for refusing his sexual advances.  In response, Arnold argues that she was subjected to a number of things that she contends constitute tangible employment actions: denial of promotions, denial of a promised $11,000 raise, undesirable reassignment, adverse job assignments (including dissecting rat intestines), insufficient job assignments, adverse job evaluations and verbal and written discipline, denial of training, denial of continuing education classes, continued requests for sexual favors, her door locks being changed, her computer being sprinkled with white powder during the Anthrax scare, her computer being tampered with or raided, being yelled at, being ostracized, being suspended, being terminated for her complaints, and being told to find another job.

While some actions taken against Arnold may qualify as tangible employment actions, Arnold has failed to demonstrate that many of these actions were taken against her because of her gender.  *See Pipkins,* 267 F.3d at 1199 (requiring that the harassment be "based on her sex"); *see also Early v. Morris Newspaper Corp.*, 54 F. Supp. 2d 1261, 1267 (M.D. Ala.

17

1999) (citations and quotations omitted) (stating that "it is essential that the plaintiff show a nexus between the harassing conduct and a job related reprisal").  To demonstrate that adverse actions were taken because of gender, "there should be a reasonable "verbal/temporal" relationship between the offensive request or conduct and discussion of the employee's job benefit or detriment." *Early*, 54 F. Supp. 2d at 1267.  If the harasser was the decision maker regarding the tangible employment action, this "gives rise to an inference that the harassed's discriminatory animus motivated that action." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1247 (11th Cir. 1998).  However, if the harasser is not the decision maker, then the plaintiff must prove that the tangible employment action was caused by a discriminatory motive.  *Id.* at 1248.

Webster, the harasser in this case, requested sexual favors from Arnold from December of 1999 until October of 2000, and engaged in sexual relations with Arnold in February and March of 2000.  Several of the actions that Arnold offers as proof of tangible employment act were clearly taken by Webster during a time when he was seeking sexual favors from Arnold: denying her requests to take courses, requesting sexual favors, yelling at her, and telling her to find another job.  Therefore, an inference arises that these actions were arguably caused by discriminatory animus, *i.e.* that they were motivated by gender. *See Llampallas*, 163 F.3d at 1247.

The remaining events that Arnold references as tangible employment actions were either clearly taken by someone other than Webster or the person who took the action is

18

unclear: denial of promotion (Williams), denial of the promised raise (unclear)[8], undesirable reassignment (Dean Atkinson), adverse job assignments (Dean Atkinson, Diffay), insufficient job assignments (Goyal), verbal and written discipline (Dean Atkinson, Diffay), denial of the database course (Diffay), door locks being changed (unclear), computer sprinkled with white powder (unclear), computer "tampered with" (unclear), being ostracized (unclear), being suspended (Diffay), and being terminated (Dean Atkinson).    Therefore, Arnold has the burden of showing that these actions were taken for discriminatory reasons. See *Llampallas*, 163 F.3d at 1248.  Because Arnold has asserted no facts and no argument

---

[8]    In the First Amended Complaint, Arnold fails to allege a basis for her sexual harassment claim that Webster refused to give her a promised salary increase because she would not capitulate to his sexual demands. Such a theory is inconsistent with the allegations of the First Amended Complaint which clearly emphasize Webster's alleged threat to terminate her employment.  It is axiomatic that a plaintiff cannot amend her complaint to add claims to an action by simply arguing the claims in a brief in opposition to summary judgment.  *See, e.g., Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004).  Even assuming *arguendo*, that this claim relating to the salary increase is properly within the ambit of the First Amended Complaint, this failure to deliver a promised salary increase cannot constitute a tangible employment action attributable to Webster as Arnold appears to argue.  The undisputed evidence before this Court does not constitute a sufficient basis from which a reasonable jury could find that Webster, directly or indirectly, caused the promised salary increase to be denied or that Webster ever made a salary increase for Arnold contingent upon Arnold's willingness to accede to his sexual demands.  Arnold contends only that in her job interview, before any sexual harassment had begun, Webster told her that after a year her salary would increase.  She does not contend that at any point Webster made any statement that in any way connected the salary increase to her willingness to be involved with him sexually.  Moreover, she does not contend that Webster ever said that he controlled or influenced how much she was paid.  There is evidence, of course, that Webster claimed to be able to terminate her employment, but that is a different issue than his ability to set or increase her salary.  Indeed, on the record before the Court, Webster's testimony that he did not control Arnold's salary is undisputed.

as to how any of these events were discrimination on the basis of her gender, or that Webster was behind such actions, they cannot be considered tangible employment actions for the purpose of Title VII.[9] Alternatively, the Court finds that many of these grounds on which Arnold relies fail to rise to the level of a tangible employment action under the applicable legal analysis.

The Court must now turn to the question of whether those actions taken arguably because of Arnold's gender rise to the level of a tangible employment action. A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761. While there is no "bright-line test for what kind of effect on plaintiff's 'terms, conditions, or privileges' of employment the alleged discrimination must have," the action must effect the plaintiff's job in a "real and demonstrable way." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). As the Court in *Davis* further stated,

> the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. . . . [A]n employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of

---

[9]Instead of supporting an inference of sex discrimination or sexual harassment, the facts show that it is unlikely that these actions were motivated by discriminatory animus based on Arnold's gender. Arnold was removed from the supervision of Webster in October 2000, at which point he was instructed not to have contact with her; the vast majority of the actions alleged by the Arnold clearly occurred after this time.

> the employer's action is not controlling; the employment action
> must be materially adverse as viewed by a reasonable person in
> the circumstances.

*Id.* at 1239 (emphasis in original).  Certainly,  "every unkind act" will not be held to violate

Title VII.  *Wu v. Thomas*, 996 F.2d 271, 273-74 (11th Cir. 1993).

It is clear that the actions taken by Webster – denying her requests to take courses, requesting sexual favors, yelling at her, and telling her to find another job – do not, independently or collectively, constitute a tangible employment action.  Regardless of Arnold's subjective opinion, no reasonable person would conclude that requests for sexual favors, being yelled at, and once being told to find another job constitute "a significant change in employment status." *Ellerth*, 524 U.S. at 761.  Additionally, as this Court has previously held in finding that failure to provide computer software and training did not constitute a tangible employment action, "Title VII is not a vehicle to be used by employees to compel their employers to upgrade their technology or training[.]"  *See Cantrell v. Jay R. Smith Mfg. Co.*,  248 F. Supp. 2d 1126, 1137-38 (M.D. Ala. 2003).  Therefore, Webster's failure to allow Arnold to take the courses she requested does not constitute a tangible employment action.  In conclusion, the Court finds that Tuskegee is not automatically liable for Webster's harassment of Arnold because Arnold has failed to demonstrate that any adverse tangible adverse employment action was taken against her because of her gender.

### b.  No Adverse Tangible Employment Action Theory

Because Arnold has failed to demonstrate that Tuskegee is liable on account of an

adverse tangible employment action against her, Tuskegee may avoid liability on Arnold's sexual harassment claim by successfully asserting the *Faragher-Ellerth* defense.  To be protected by this defense, a defendant must establish that (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the plaintiff unreasonably failed to avail herself of preventative or corrective opportunities provided by the employer or to otherwise avoid harm.  *See Faragher*, 524 U.S. at 807.  Because Arnold asserts that Tuskegee has failed to establish either element, the Court will address them both in turn.

### i. Defendant's Reasonable Care to Prevent and Promptly Correct

An entity may demonstrate reasonable care by showing the development of "an effective and comprehensive anti-sexual harassment policy," which is "aggressively and thoroughly disseminated," and to which the employer "demonstrate[s] a commitment to adhering."  *Farley v. American Cast Iron Pipe Co.,* 115 F.3d 1548, 1554 (11th Cir. 1997).  In this case, it is undisputed that Tuskegee had a comprehensive policy, which protected its students, faculty, and staff from a wide range of sexually harassing behaviors by any member of the academic community.  Arnold admits that she received a copy of this policy upon being hired in July of 1999 and has offered no facts to indicate that the policy was not similarly disseminated to other employees.  Moreover, it is undisputed that Arnold had successfully used this policy to make a complaint during her earlier period of employment.

Arnold argues, however, that Tuskegee failed to take appropriate action about the sexually harassing behavior.  She states that the Human Resources manager refused to acknowledge her complaints and that Dean Atkinson and a professor in the department named Dixon did not respond properly.  Regarding the complaints to Dean Atkinson and Dixon, Arnold has failed to assert facts that indicate that she told them of the nature of her complaint, *i.e.* that she was being sexually harassed as opposed to her merely having a "problem" with Webster.  Indeed, the record is undisputed that once the nature of Arnold's complaints against Webster were know to be concerning sexual harassment, Tuskegee investigated and took prompt, effective action which curtailed Webster's sexual harassment of Arnold.  The Court is persuaded on the basis of the record before it that Tuskegee exercised reasonable care to prevent and correct promptly any sexually harassing behavior.

### ii.  Plaintiff's Unreasonable Failure to Avoid Harm

A demonstration that the employee at issue has failed to use the policy in existence "will normally suffice to satisfy the employer's burden under the second element of the defense."  *Faragher v. City of Boca Raton, Fla.*, 524 U.S. 775, 807-08 (1998).  Here, Tuskegee has demonstrated that despite her personal knowledge of the policy at Tuskegee and her past experience successfully using the policy to obtain relief from what she considered sexual harassment, Arnold unreasonably failed to report Webster when the sexual harassment began.  Indeed, she endured the harassment for months after telling Webster she would no long have sexual relations with him anymore.  Her failure to use Tuskegee's policy

to avoid Webster's unwelcome advances satisfies the second element Tuskegee must show to establish its affirmative defense.  In light of the facts and circumstances of this case, Tuskegee is entitled to prevail on Arnold's sexual harassment claim because, as a matter of law, the affirmative defense outlined in *Faragher-Ellerth* entitles it to avoid liability for Webster's harassment of Arnold.

### 2.  *Retaliation*

As previously stated, Arnold's second federal claim against Tuskegee is brought pursuant to Title VII for what she alleges was retaliation against her.  As framed in the First Amended Complaint (Doc. # 15), Arnold's retaliation claim is that Tuskegee retaliated against her after she filed her Charge of Discrimination with the EEOC in December of 2000 and after the EEOC's investigation and cause finding in the Spring of 2002.  (Doc. # 15 at ¶¶ 29, 37, 38, & 39).  Arnold also alleges that Tuskegee retaliated against her by terminating her employment after she filed this lawsuit in January of 2003.  (Doc. # 15 at ¶ 39).  Arnold alleges that Tuskegee retaliated against her for her complaints of sexual harassment by Webster and that the retaliation was comprised of material alterations in her work environment and conditions and, ultimately, the termination of her employment.  (Compl. at ¶ 53).

In her First Amended Complaint, Arnold alleged that after she reported the sexual harassment she was retaliated against by Tuskegee through Webster and other employees in numerous ways, including the withholding of promotions, job transfers, education, training,

supplies and office furniture as well as the receipt of unfavorable job assignments, negative reviews, extra supervision regarding time sheets, and unidentified white powder on her desk during the Anthrax scares.  She states that Tuskegee ultimately retaliated against her by suspending her for three days beginning on March 25, 2003, and then terminating her employment on April 2, 2003.

In response, Tuskegee contends that Arnold had a history of failure to follow University policy, failure to submit accurate time sheets and insubordinate conduct, specifically that Arnold repeatedly called other employees liars.  Tuskegee alleges that it took prompt remedial action against the sexual harassment, never retaliated against Arnold, and ultimately suspended and terminated Arnold for her insubordination.

The analysis of a claim of retaliation based on circumstantial evidence[10] is similar to the analysis of a discrimination claim based on circumstantial evidence.

> To establish a prima facie case of retaliation, [an employee] must show: (1) she engaged in protected activity; (2) her employer was aware of that activity; (3) she suffered adverse employment action; and (4) there was a causal link between her protected activity and the adverse employment action.

*Maniccia v. Brown,* 171 F.3d 1364, 1369 (11th Cir. 1999) (*citing Little v. United Tech.,* 103 F.3d 956, 959 (11th Cir. 1997)).  *Accord, Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir. 1998) (citations omitted).

Arnold's complaints about Webster's alleged sexual harassment, both to Williams and

---

[10]  There is no direct evidence of retaliation in this case.

to the EEOC, constitute protected expression for purposes of establishing a *prima facie* case of retaliation.  Protected expression includes filing complaints with the EEOC or through an employer's internal grievance procedure. *Berman v. Orkin Exterminating Co.,* 160 F.3d 697, 702 (11th Cir. 1998) (filing EEOC complaint is protected conduct); *Rollins v. Florida Dep't of Law Enforcement,* 868 F.2d 397, 400 (11ᵗʰ Cir. 1989) (internal complaints of discrimination are statutorily protected conduct).  "To establish that a plaintiff engaged in statutorily protected expression, ... a plaintiff must show that she 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311 (11th Cir. 2002).  Moreover, the filing of a lawsuit setting forth claims of discrimination constitutes protected expression.  Additionally, there is no dispute that Tuskegee was aware of Arnold's protected expression.

Arnold's evidence that Tuskegee suspended her in late March of 2003, and then terminated her employment on April 2, 2003, suffices to establish the third element of the *prima facie* case.  Tuskegee does not dispute that Arnold's termination constitutes an adverse employment action for purposes of the *prima facie* case of retaliation.[11]

_____

[11] Tuskegee does, however, contend that none of the other complaints that Arnold has raised about how she was treated after complaining about Webster constitute adverse employment actions sufficient to satisfy the third element of the *prima facie* case.  In her First Amended Complaint, Arnold alleges that she was subject to the following retaliatory conduct: receipt of letters containing false and misleading statements, denial of requests to transfer, denial of the opportunity to advance, attempts to place her in jobs for which she was unqualified, requirement of back-dating time sheets, requirement of deducting administrative leave from vacation time, assignment of tasks formerly performed by individuals at higher levels, unauthorized entry of her office, placement of white powder in her office, denial of

As is common in these types of cases, the real issue with respect to Arnold's *prima facie* showing on her retaliation claim is the fourth element which requires a showing of a causal link between the alleged adverse employment action and the protected activity. "The

training, withholding of pay, and termination. (Doc. # 15 at ¶¶ 37, 39.) In her arguments and evidentiary submissions in opposition to summary judgment, Arnold focuses on the suspension and termination as her evidence of adverse employment actions for purposes of her retaliation claim. "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). Whether an employee has suffered an adverse employment action is normally considered on a case-by-case basis. *Id*. at 586. It is clear, however, that not all conduct taken by an employer which causes a negative affect on an employee constitutes adverse employment action. *See Davis*, 245 F.3d 1232. There must be "some threshold level of substantiality that must be met for unlawful discrimination to be cognizable." *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir. 1998). "This limitation is consistent with the basic principle that Title VII is . . . neither a general civility code nor a statute making actionable for the 'ordinary tribulations of the workplace.'" *Davis*, 245 F.3d at 1239 (quoting *Gupta*, 212 F.3d at 587); *see also Wu v. Thomas*, 996 F.2d at 273-274 (noting that an adverse employment action does not result from every unkind act, even those without economic consequences). In *Davis*, the Eleventh Circuit emphasized that for an employment action to be adverse it "must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." 245 F.3d at 1239. While proof of direct economic consequences is not required in all cases, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id*. Thus, to prove an adverse employment action "an employee must show a *serious and material* change in terms, conditions, or privileges of employment." *Id*. (emphasis in original). In determining whether a "serious and material" change in the terms, conditions, or privileges of employment has been established, *Davis* instructs the court to disregard the plaintiff's subjective view of the significance and adversity of the employer's action: "[T]he employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id*. (citation omitted). Leaving aside Arnold's disciplinary suspension and termination, the Court is not persuaded that the alleged acts of retaliation against Arnold constitute a serious and material change in the terms or conditions of her employment in the circumstances of this case.

causal link element is construed broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001) (citations omitted). One common method of establishing the causal link element is close temporal proximity between the adverse employment action and the protected activity. Of course, this is not the sole means of establishing the causal link element; rather it is merely the most commonly used approach.

In this case, Arnold fails as a matter of law to establish the causal link by temporal proximity between her suspension and termination and her internal report of sexual harassment or her initial EEOC Charge of Discrimination. Simply put, the events are too remote for the temporal proximity to create any inference of causation. *See, e.g., Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir. 2004); *Wascura v. City of So. Miami,* 257 F.3d 1238, 1248 (11th Cir. 2001). With respect to her allegation that the suspension/discharge decisions were retaliation for her filing this lawsuit against Tuskegee, however, the temporal proximity is much closer (less than three months). Accordingly, the Court assumes *arguendo* that Arnold has presented evidence that could arguably be said to establish a *prima facie* case of retaliation.[12]

_____

[12] While this theory of the case is clearly articulated in the First Amended Complaint, Arnold does not argue this theory in her lengthy and numerous submissions in opposition to summary judgment. This is a troubling omission because it is not the Court's role to develop or discover a party's arguments. Nevertheless, the Court will briefly address this theory out of an abundance of caution because it was very clearly included in the pleadings in this case.

If the plaintiff establishes a *prima facie* case of retaliation, the burden then shifts to the employer to rebut the presumption by articulating legitimate, non-retaliatory reasons for its employment action.  *See, e.g., Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir. 1997); *Olmsted*, 141 F.3d at 1460.  "This intermediate burden is exceedingly light." *Id*. (internal quotations omitted).  The employer has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced.  *See McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973); *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253-255 (1981).

Here, Tuskegee has presented evidence that establishes that Arnold's employment was terminated because she continued to engage in insubordinate conduct after being advised that failure to modify her conduct could result in discharge.  Indeed, the record before this Court establishes that Arnold had a long history of failing to follow Tuskegee's rules, policies and regulations and a pattern of engaging in conduct which was clearly insubordinate.  The provisions in Title VII against retaliation are designed and intended to prevent employers from improperly punishing employees who have exercised their right to engage in protected conduct.  These provisions are not intended to insulate an employee from discipline for violating the employer's rules or disrupting the workplace.

Once the employer satisfies this burden of production, as Tuskegee has here, "the presumption of [retaliation] is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima*

*facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citations omitted).  The establishment of a *prima facie* case does not in itself entitle a plaintiff to survive a motion for summary judgment.  *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987); *Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1389 (11th Cir. 1983).  After an employer proffers non-retaliatory reasons for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered . . . reasons is pretextual."  *Chapman*, 229 F.3d at 1037.

Arnold offers little in the way of evidence of pretext.  She appears to argue that the timing of the events in question constitutes circumstantial evidence of some connection between her protected conduct and her suspension and termination.  Close temporal proximity between protected conduct and an adverse employment decision cannot alone create a genuine issue of material fact on the issue of whether the employer's proffered non-retaliatory reason was pretextual.  *See, e.g., Wascura,* 257 F.3d at 1245; *Stewart v. Happy Herman's Chesire Bridge, Inc.,* 117 F.3d 1278, 1287-88 (11th Cir. 1997); *Padron v. BellSouth Telecomm., Inc.,* 196 F. Supp. 2d 1250, 1256-60 (S.D. Fla. 2002), *aff'd without opinion,* 62 Fed. App. 317 (11th Cir. 2003).  *Accord, Tran v. Trustees of State Colls. in Colo.,* 355 F.3d 1263, 1270 (10th Cir. 2004).  Thus, the question is whether Arnold has presented enough other evidence of pretext to warrant sending this case to a trial before a

30

jury.  The Court has carefully reviewed Arnold's arguments and evidence on the issue of pretext.  It is simply not persuaded that any reasonable jury could review the evidence on which Arnold relies as establishing that the proffered legitimate, non-retaliatory reasons for the suspension and discharge of Arnold were, in fact, pretextual.  Accordingly, Tuskegee is entitled to judgment as a matter of law on this claim as well.

**B. State Law Claims**

Arnold also claims that Tuskegee is liable under Alabama law and brings claims against Tuskegee for intentional infliction of emotional distress (Count Three), breach of contract (Count Four), breach of implied covenant of good faith and fair dealing (Count Five), and negligent hiring, training, supervision and retention (Count Six).[13]  This Court has supplemental subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1367.  Section 1367(c)(3) provides that a "district court may decline to exercise supplemental jurisdiction over a claim if... the district court has dismissed all claims over which it has original jurisdiction."  Because the federal claims over which this Court had original jurisdiction have now been resolved against Arnold, the Court will dismiss the state law claims, albeit without prejudice.  *See, e.g.,* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726-27 (1966).  This dismissal should not work to Arnold's

---

[13]  By prior Order of this Court, Arnold's motion to dismiss the claim in Count Six of negligent retention was granted and that claim was dismissed.  Arnold has also given verbal indication that she intended to abandon her claim in Count Six of negligent hiring, but she did not file a motion as to that claim.

disadvantage should she elect to bring suit in state court because the period of limitations for any of these claims is tolled during the pendency of this action.  *See* 28 U.S.C. § 1367(d).

## VI. CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

(1)  Tuskegee's Motion for Summary Judgment (Doc. #57) is GRANTED with respect to all of Arnold's claims pursuant to federal law (Count One and Count Two) and those claims are DISMISSED WITH PREJUDICE.

(2)  All federal claims having been resolved, the Court declines to exercise supplemental jurisdiction over the claims pursuant to Alabama law (Counts Three, Four, Five and Six) and those claims are DISMISSED WITHOUT PREJUDICE.

(3)  In light of the foregoing, this Court need not address the Motion to Disqualify Attorney Priscilla Black Duncan as Witness (Doc. # 89) and that motion is hereby DENIED without prejudice to its refiling, if necessary.

(4)  The pretrial and trial are CANCELLED.

(5)  A separate final judgment will be entered consistent with this Memorandum Opinion and Order.

DONE this the 9th day of January, 2006.


_____
         /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE